Glenn R. Kantor, State Bar No. 122643
  E-mail: gkantor@kantorlaw.net
Timothy J. Rozelle, Esq. State Bar No. 298332
  E-mail: trozelle@kantorlaw.net
KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525 (Tel)
(818) 350 6272 (Fax)

Attorneys for Plaintiff
ARAM HOMAMPOUR,
on behalf of himself and all others
similarly situated

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ARAM HOMAMPOUR, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BLUE SHIELD OF CALIFORNIA LIFE AND HEALTH INSURANCE COMPANY,<br><br>Defendant. | Case No.:<br><br>**CLASS COMPLAINT**<br><br>**COMPLAINT FOR:**<br><br>**(1) COMPLAINT FOR RECOVERY OF ERISA PLAN BENEFITS;**<br><br>**(2) CLASS ACTION COMPLAINT FOR CLARIFICATION OF RIGHTS AND BREACH OF FIDUCIARY DUTY** |

**INTRODUCTION AND GENERAL ALLEGATIONS**

1. Hepatitis C was first discovered in 1990 and is a contagious virus that attacks the liver. It spreads primarily through contact with the blood of an infected person. In 1992, the United States began screening blood utilized in transplants and transfusions for the presence of contagious diseases including Hepatitis C. Before 1992, Hepatitis C was commonly spread through blood transfusions or transplant surgeries.

2. Hepatitis C can also be transmitted from mothers to infants at birth. Several factors influence the likelihood that the virus will be passed from mother to

Case 3:15-cv-05003-WHO   Document 1   Filed 10/30/15   Page 2 of 18

child including the viral load of the mother, the gender of the newborn, and whether there is premature membrane rupture.

3. Hepatitis C has six different genotypes, or virus classifications, based on the virus's genetic material in the RNA strands. Genotype 1 is the most common in the United States. It accounts for approximately 75% of Americans with the disease and was considered the most difficult genotype to treat. Mr. Homampour has genotype 1b Hepatitis C. Genotypes 2 and 3 are less common, affecting approximately 20% of those with Hepatitis C and are much easier to cure.

4. Hepatitis C is a widespread contagious disease in the United States with severe public health ramifications. It is estimated that more than three million individuals in the United States are living with chronic Hepatitis C, and it is estimated that 3% of the world's population is infected with the disease. Approximately 15,000 people in the United States die each year due to liver disease caused by Hepatitis C. By 2000, Hepatitis C had infected almost 600,000 people in California alone, and another 5,000 Californians become infected with the virus each year.

5. Hepatitis C can lead to severe liver damage, infections, liver cancer, and even death. Even before liver deterioration, those with Hepatitis C can suffer other health issues including a higher risk of heart attack, fatigue, joint pain, depression, sore muscles, arthritis, and jaundice. Centers for Disease Control and Prevention statistics reveal that up to 70% of those with Hepatitis C will develop chronic liver disease, 20% will develop cirrhosis, and 5% will develop liver cancer. Hepatitis C also leads to liver fibrosis, which is the first stage of liver scarring. The degree of fibrosis varies and is described in several stages from F0 to F4. No scarring in the liver is designated as stages F0 or F1. Individuals in stage F3 suffer from severe fibrosis and stage F4 indicates cirrhosis.

CLASS COMPLAINT

6. Prior to FDA approval of Harvoni in 2014, the standard of care in the medical community for the treatment of Hepatitis C was a three-drug treatment containing boceprevir, interferon, and ribavirin, at a cost of $170,000. That three-drug treatment provided a 70% cure rate but came with tremendous adverse side effects including, anemia, insomnia, anxiety, depression, and memory loss.

7. In October 2014, the FDA approved Harvoni, a prescription drug that dramatically changes the lives of those infected with Hepatitis C. Harvoni is a once daily tablet that can cure Hepatitis C in as little as eight weeks with few side effects. In clinical studies, 95%-99% of Hepatitis C patients were cured with just eight to twelve weeks of Harvoni treatments. Since 2014, the standard of care in the medical community for treating Hepatitis C patients is Harvoni, which provides a cure rate of 95%-99% at a cost of $99,000 for a 12-week treatment with little to no harmful side effects.

8. This revolutionary cure is not only far more effective than other treatment options, but eliminates the harmful side effects associated with other available treatments such as Sovaldi, a prescription medication utilized in combination with ribavirin. Other treatment options result in severe, unbearable side effects such as nausea, fatigue, anemia, insomnia, anxiety, diarrhea, low red blood cell count, depression, memory loss, and muscle, joint, or bone pain. In contrast, the most severe common side effects associated with Harvoni are tiredness and headaches. In light of its high success rate and minimal side effects, in 2014 Harvoni was designated by the FDA as a "breakthrough therapy." This designation is reserved for drugs that have proven to provide substantial improvement over available therapies for patients with serious or life-threatening diseases.

9. Hepatitis C is only the second disease or condition for which a cure has been discovered in a single life-span from the discovery of the disease or condition. Hepatitis C was discovered in 1990 and the cure arrived in 2014.

Hepatitis C could become completely eradicated in the coming few years as a result of Harvoni, assuming patients, such as Mr. Homampour, have access to this incredible cure.

## THE PARTIES

10. Plaintiff ARAM HOMAMPOUR is and was at all relevant times a resident of Los Angeles County, California.

11. Plaintiff was at all relevant times a covered participant under a Blue Shield of California HMO health benefit plan for SwedelsonGottlieb (the "Plan"), an employee welfare benefit plan regulated by ERISA and pursuant to which Plaintiff is entitled to health care benefits.  *See* Exhibit A, Mr. Homampour's Blue Shield HMO Plan.

12. Defendant BLUE SHIELD OF CALIFORNIA LIFE AND HEALTH INSURANCE COMPANY ("Blue Shield") is a corporation with its principal place of business in the State of California, authorized to transact and transacting business in this judicial district, the Northern District of California, and can be found in the Northern District of California.  Defendant sells and markets its insurance products to millions of consumers in California, and across the nation. Additionally, Blue Shield offers its claims administration services and insurance products to employers (which offer health benefits to their employees) in California, and across the nation.  Thus, venue is proper in this judicial district pursuant to 29 U.S.C. § 1132(e)(2) (special venue rules applicable to ERISA actions).

## ALLEGATIONS REGARDING CLASS REPRESENTATIVE

13. Mr. Homampour has Hepatitis C.  Mr. Homampour sought the medical consultation of Dr. Sammy Saab, a leading hepatalogist at the UCLA Pfleger Liver Institute in Los Angeles, California.  Dr. Saab informed

Mr. Homampour of the available treatment options and his prognosis given those options. Dr. Saab is a board-certified gastroenterologist and transplant hepatologist. He received his medical degree from UCLA.

14. Dr. Saab prescribed Mr. Homampour a regimen of Harvoni and promptly requested authorization from Blue Shield for the medication.

15. Blue Shield denied Mr. Homampour's request for Harvoni treatment, claiming that the medication was "not medically necessary" for him because his liver had not sufficiently deteriorated.

16. On March 24, 2015, Dr. Saab appealed Blue Shield's prior authorization denial, on Mr. Homampour's behalf, for coverage of Harvoni.

17. On April 22, 2015, Blue Shield denied Mr. Homampour's appeal on the following grounds:

> According to the Blue Shield medical necessity criteria for coverage of Harvoni for the treatment of Hepatitis C, evidence of compensated or advanced liver disease confirmed by a biopsy with a METAVIR score (a score that ranges from F0-F4 and assesses the health of the liver) of F3 or F4, or other accepted measure of fibrosis (scar) scoring is required.
>
> . . .
>
> A January 21, 2015, FibroSPECT fibrosis score was consistent with F0-F1.
>
> . . .
>
> Therefore this patient does not meet the Blue Shield medical necessity criteria for coverage of Harvoni for the treatment of hepatitis C.

*See* Exhibit B, Blue Shield April 22, 2015 Appeal Denial Letter to Mr. Homampour.

/ / /

5
CLASS COMPLAINT

18. Blue Shield left Mr. Homampour to live with daily pain, depression, and chronic fatigue, and to wait until his liver drastically worsened before Blue Shield would approve the medication.

19. As a result of Blue Shield's unreasonable interpretation of Mr. Homampour's Plan and wrongful denial of benefits, Mr. Homampour has been unable to begin the Harvoni treatment which would cure his disease. At a cost of roughly $99,000 for a 12-week regimen, on average, he is unable to pay for the treatment out-of-pocket.

20. Mr. Homampour sought coverage for Harvoni treatment under a Blue Shield HMO Plan which provides coverage for medically necessary care in exchange for the payment of premiums. Mr. Homampour's Plan defines "medically necessary" as follows:

> Services which are Medically Necessary include only those services which have been established as safe and effective and are furnished in accordance with generally accepted professional standards to treat an illness, injury, or medical condition, and which, as determined by Blue Shield, are:
>
>   a. Consistent with Blue Shield medical policy; and,
>   b. Consistent with the symptoms or diagnosis; and,
>   c. Not furnished primarily for convenience of the patient, the attending Physician or other provider; and,
>   d. Furnished at the most appropriate level which can be provided safely and effectively to the patient.

*See* Exhibit A, Blue Shield HMO Plan, at B-66.

21. The American Medical Association defines medical necessity as: "Health care services or products that a prudent physician would provide to a patient for the purpose of preventing, diagnosing or treating an illness, injury, disease or its symptoms in a manner that is: (a) in accordance with generally

1  accepted standards of medical practice; (b) clinically appropriate in terms of type,
2  frequency, extent, site, and duration; and (c) not primarily for the economic benefit
3  of the health plans and purchasers or for the convenience of the patient, treating
4  physician, or other health care provider."[1]

5      22.    Furthermore, the Institute of Medicine stated that services meeting the
6  requirements of medical necessity will be those that are: "(1) clinically appropriate
7  for the individual patient, (2) based on the best scientific evidence, taking into
8  account the available hierarchy of medical evidence, and (3) likely to produce
9  incremental health benefits relative to the next best alternative that justify any
10  added cost."[2]

11      23.    Harvoni meets all of these requirements. Nothing requires that a
12  member allow his or her medical condition to deteriorate to severe fibrosis in order
13  for their care to be considered "Medically Necessary." But the definition of
14  "Medical Necessary" is not the test that Blue Shield used to deny
15  Mr. Homampour's pre-authorization request for Harvoni. Rather, Blue Shield
16  applied a more restrictive test, its internally-developed medical policy, in an effort
17  to increase company profits by limiting the number of patients who would qualify
18  for this life-saving medication.

19      24.    Blue Shield's requirement of severe fibrosis before treatment severely
20  limits insureds' access to medically necessary treatment and places artificial
21  restrictions on treatment that are not disclosed in the Plan. Mr. Homampour had
22  no notice before receiving Blue Shield's initial denial letter that coverage could be

---

[1] Statement of the American Medical Association to the Institute of Medicine's Committee on Determination of Essential Health Benefits January 14, 2011, http://www.iom.edu/~/media/8D03963CAEB24450947C1AEC0CAECD85.ashx.

[2] *See, e.g.*, Inst. of Med., Essential Health Benefits: Balancing Coverage and Costs xi (2011) (describing the major goals of specifying essential health benefits as "balancing the comprehensiveness of benefits with their cost").

1  determined by anything outside of his Plan, or that Blue Shield would place
2  arbitrary restrictions on who can access medically necessary treatment.

3       25.    Despite the plain language of Mr. Homampour's Plan, Blue Shield did
4  not rely on it to determine if Harvoni was covered.  Instead, Blue Shield used an
5  undisclosed internal guideline (a medical policy), only created to elevate profits
6  over concerns for the health of its insureds.

## GENERAL ALLEGATIONS

9       26.    This action is brought under 29 U.S.C. §§ 1132(a), (e), (f) and (g) of
10 the Employee Retirement Income Security Act of 1974 (hereinafter "ERISA") as it
11 involves a claim by Plaintiff for employee benefits under an employee benefit plan
12 regulated and governed by ERISA.  Jurisdiction is predicated under these code
13 sections, as well as 28 U.S.C. § 1331, as this action involves a federal question.
14 This action is brought for the purpose of obtaining benefits under the terms of
15 (1) employer-sponsored self-funded[3] employee benefit plans and (2) fully-insured
16 / / /

18 / / /

20 / / /

22 / / /

24 / / /

---

[3] Traditional self-funding is defined as when an employer pays for their own medical claims directly, while a third-party administrator (like Blue Shield) administers the health plan by processing the claims, issuing ID cards, handling customer questions and performing other tasks.

employee benefit plans, which are administered[4] by Blue Shield, enforcing Plaintiff and the Plaintiff Class' rights under the terms of those employee benefit plans, and to clarify Plaintiff's rights to future benefits under those employee benefit plans. Plaintiff and the Plaintiff Class seek relief including, but not limited to: payment of benefits, prejudgment and post-judgment interest, and attorneys' fees and costs.

27. Plaintiff and members of the Plaintiff Class have requested that Defendant provide coverage for Harvoni treatment regimens. Defendant has denied these claims on one or both of two grounds: either stating that based upon (1) its plans' definitions of "medical necessity" and covered benefits or (2) its plans' exclusions for experimental, investigational or unproven services, such treatment is not a covered benefit under the plans at issue.

28. Despite the obligations, responsibilities and requirements which arise under ERISA statutes and regulations, Blue Shield has engaged and continues to

---

[4] A plan which is administered by Blue Shield can include a plan in which Blue Shield is a third party claims administrator or a properly delegated or named plan administrator. The Ninth Circuit has determined that proper defendants under § 1132(a)(1)(B) for improper denial of benefits at least include ERISA plans, *formally designated plan administrators*, i*nsurers or other entities responsible for payment of benefit*s, and *de facto plan administrators* that improperly deny or cause improper denial of benefits. Suits under § 1132(a)(1)(B) to recover benefits may be brought "against the plan as an entity *and against the fiduciary of the plan.*" *Hall v. Lhaco, Inc.*, 140 F.3d 1190, 1194 (8th Cir. 1998) (emphasis added) (collecting *1298 cases) (emphasis added). A fiduciary is any entity that "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets ... [or] has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A); *see LifeCare Mgmt. Servs. LLC v. Ins. Mgmt. Adm'rs Inc.,* 703 F.3d 835, 844–45 (5th Cir. 2013) (holding that a third-party administrator that neither was designated as the plan administrator nor was responsible for paying claims was nonetheless a proper defendant based on the control it exercised over benefits claims processing). *Spinedex Physical Therapy USA Inc. v. United Healthcare of Arizona, Inc.*, 770 F.3d 1282, 1297-98 (9th Cir. 2014) cert. denied sub nom. *United Healthcare of Arizona v. Spinedex Physical Therapy USA, Inc.*, No. 14-1286, 2015 WL 1914438 (U.S. Oct. 13, 2015) (emphasis added).

1  engage in claims handling practices which are flatly inconsistent with the ERISA
2  statutes and regulations and the broad protective purposes of ERISA.
3      29.   ERISA requires that all employee benefit plans establish and maintain
4  reasonable claims procedures.  Specifically, 29 C.F.R. section 2560.503-1(b)(5)
5  requires that "[t]he claims procedures contain administrative processes and
6  safeguards designed to ensure and to verify that benefit claim determinations are
7  made in accordance with governing plan documents and that, where appropriate,
8  the plan provisions have been applied consistently with respect to similarly situated
9  claimants." 29 C.F.R. § 2560.503-l(b)(5).
10     30.   Despite these clear requirements, Blue Shield has engaged in and
11 continues to engage in a pattern of unreasonable and egregious claims handling
12 practices which have directly and adversely impacted individuals suffering from
13 Hepatitis C, and particularly those individuals with a METAVIR liver fibrosis
14 staging score[5] of F0, F1 or F2 on a scale F0-F4[6], such as Plaintiff Aram
15 Homampour.
16     31.   Blue Shield has applied and continues to apply it is own internal
17 clinical guidelines in a manner which artificially restricts prescription drug
18 treatment of Hepatitis C to individuals with F3 or F4 stage liver fibrosis, a practice
19 wholly inconsistent with the terms of Mr. Homampour's Blue Shield Plan, the

---

[5] The Metavir scoring system was specially designed for patients with hepatitis C.  The scoring consists of using a grading and a staging system.  The grade gives an indication of the activity or amount of inflammation and the stage represents the amount of fibrosis or scarring.  The grade is assigned a number based on the degree of inflammation, which is usually scored from 0-4 with 0 being no activity and 3 or 4 considered severe activity.  The amount of inflammation is important because it is considered a precursor to fibrosis.

[6] The fibrosis score is assigned a number from 0-4:
- 0 = no scarring
- 1 = minimal scarring
- 2 = scarring has occurred and extends outside the areas in the liver that contains blood vessels
- 3 = bridging fibrosis is spreading and connecting to other areas that contain fibrosis
- 4 = cirrhosis or advanced scarring of the liver

1  terms of the Plans of class members, and in contravention of 29 C.F.R. section
2  2560.503-l(b)(5).

3      32.    ERISA only allows claims administrators to rely on internal rules or
4  policies in construing the terms of an employee benefits plan if those rules or
5  policies reasonably interpret the applicable plan.  In violation of ERISA statutes
6  and regulations, Blue Shield has systematically ignored the treatment
7  recommendations of insureds' providers and used internal clinical guidelines
8  which are inconsistent with the plain language of insureds' plans.

9      33.    No scientific evidence affirmatively states that treating individuals
10 with F0 – F1 stage fibrosis with Harvoni results in adverse medical outcomes or
11 could best be treated by other means.  Given the effectiveness of the newest, all-
12 oral treatments and the health benefits of treatment for individuals infected with
13 hepatitis C and for society, a panel convened by the California Technology
14 Assessment Forum and several participants on the policy roundtable even
15 concluded that there is a *societal imperative* to treat all infected patients.

16     34.    Here, Blue Shield can point to no generally accepted standards of
17 medical practice in the medical community which allow for artificial limitations on
18 which patients may receive Harvoni treatment.  In fact, claims administrators can
19 rely on internal rules or policies in construing the terms of an employee benefits
20 plan only if these rules or policies reasonably interpret the plan.  *See Smith v.*
21 *Health Servs. of Coshocton*, 314 F. App'x 848, 859 (6th Cir. 2009); *Tiemeyer v.*
22 *Cmty. Mut. Ins. Co.*, 8 F.3d 1094, 1100 (6th Cir. 1993); *also see Egert v. Conn.*
23 *Gen. Life Ins. Co.*, 900 F.2d 1032, 1036 (7th Cir. 1990); *May v. Roadway Express,*
24 *Inc.*, 813 F.Supp. 1280, 1284 (E.D. Mich. 1993).

25     35.    Blue Shield relies on extrinsic sources to develop these artificially
26 restrictive internal clinical guidelines.  Blue Shield's arbitrary application of its
27 internal clinical guidelines is "flatly inconsistent with the 'broadly protective'
28

purposes of ERISA" and would allow Blue Shield the "free reign to re-write plan terms and restrict or broaden coverage as they see fit." *Egert*, 900 F.2d at 1036.

36.     The Class Members' plans provide coverage for medically necessary care. The plans contain a definition of medical necessity, which are the only criteria of which Blue Shield members are aware. For a medication such as Harvoni to be medically necessary, it must be a drug that a medical practitioner would provide to a member for purposes of treating an illness, injury, or disease, in accordance with generally accepted standards of medicine, clinically appropriate, not primarily for the patient's convenience, and not more costly than an equivalent service that is medically appropriate and likely to produce equivalent therapeutic results.

37.     By using these restrictive medical criteria as a barrier to access Harvoni, Blue Shield is breaching its Plans' provisions with its members. The members' plans contain the entirety of the terms of the agreement.

38.     Blue Shield's investigation of the medical necessity of Harvoni was conducted by unqualified reviewers in violation of California Health and Safety Code section 1367.01, and at odds with the Plan.

39.     Subdivision (e) of California Health and Safety Code section 1367.01 provides, in relevant part, the following:

> [N]o individual, other than a licensed physician or a licensed healthcare professional who is competent to evaluate the specific clinical issues involved in the health care services requested by the provider, may deny or modify requests for authorization of healthcare services for an enrollee for reasons of medical necessity.

Cal. Health & Saf. Code § 1367.01.

/ / /

40. In addition, Blue Shield has consistently utilized unqualified reviewers in violation of California Health and Safety Code section 1367.01. Blue Shield fails to identify the qualifications or specialties of the reviewers in denial letters. As a result, members are unable to determine if these individuals are competent to evaluate the specific issues, as required by § 1367.01.

## CLASS ALLEGATIONS

41. This is a class action pursuant to Federal Rules of Civil Procedure Rule 23 on behalf of Plaintiff and all individuals:

> whose requests for Harvoni treatment have been denied (at any time under the applicable statute of limitations) under any ERISA-governed self-funded or fully-insured group health insurance plan issued or administered by Blue Shield.

42. Plaintiff and the Plaintiff Class reserve the right under Federal Rule of Civil Procedure Rule 23(c)(1)(C) to amend or modify the class to include greater specificity, by further division into subclasses, or by limitation to particular issues.

43. This action has been brought and may be properly maintained as a class action under the provisions of Federal Rules of Civil Procedure Rule 23 because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

**Numerosity**

44. The potential members of the proposed class as defined are so numerous that joinder of all the members of the proposed class is impracticable. While the precise number of proposed class members has not been determined at this time, Plaintiff is informed and believes that there are a substantial number of individuals covered under Blue Shield-administered plans who have been similarly affected.

**Commonality**

45. There are questions of law and fact common to the proposed class that predominates over any questions affecting only the individual class members. These common questions of law and fact include, without limitation:

    (a)    Whether Defendant wrongfully denied plan benefits under ERISA.

    (b)    Whether Defendant has breached its fiduciary duties under ERISA in its administration of Plaintiff and the Plaintiff Class' claims for health benefits.

**Typicality**

46. The claims of the named Plaintiff are typical of the claims of the proposed class. Plaintiff and all members of the Plaintiff Class sustained damages arising out of and caused by Defendant's violation of federal law and federal code sections as alleged herein.

**Adequacy of Representation**

47. Plaintiff will fairly and adequately represent and protect the interests of the members of the proposed class. Counsel who represent Plaintiff are competent and experienced in litigating large and complex class actions.

**Superiority of Class Action**

48. A class action is superior to other available means for the fair and efficient adjudication of this controversy. Individual joinder of all members of the proposed Plaintiff Class is not practicable, and questions of law and fact common to the proposed Plaintiff Class predominate over any questions affecting only individual members of the Plaintiff Class. Each member of the proposed Plaintiff Class has been damaged and is entitled to recovery by reason of Blue Shield's conduct in denying claims for Harvoni treatment.

///

49. Class action treatment will allow those similarly situated persons to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## FIRST CAUSE OF ACTION
## FOR DENIAL OF PLAN BENEFITS UNDER ERISA

50. Plaintiff and the Plaintiff Class repeat and re-allege each and every allegation set forth in all of the foregoing paragraphs as is fully set forth herein.

51. Plaintiff and the Plaintiff Class are covered by insurance plans issued by Defendant. Under the terms and conditions of the insurance plans and applicable federal law, Blue Shield is required to pay for all medically necessary prescription medication benefits.

52. Defendant violated ERISA by wrongfully asserting that Harvoni treatment is not a covered benefit under the plans.

53. As a direct and proximate result of Defendant's actions in denying claims for medically necessary Harvoni treatment, Plaintiff and the Plaintiff Class were forced financially to forego treatment altogether. Plaintiff and the Plaintiff Class are entitled to the reasonable value of the medically necessary Harvoni treatment and related expenses.

54. Defendant wrongfully denied Plaintiff and the Plaintiff Class' claims for Harvoni treatment, in the following respects, among others:

    (a) Failure to pay prescription drug benefit payments due to Plaintiff and the Plaintiff Class at a time when Defendant knew, or should have known, that Plaintiff and the Plaintiff Class were entitled to those benefits under the terms of the Defendant's plans;

     (b)    Failure to provide prompt and reasonable explanations of the bases relied on under the terms of the plans, in relation to the applicable facts, laws and plans' provisions, for the denial of the claims for prescription drug benefits;

     (c)    Failure to properly and adequately investigate the merits of the Plaintiff and the Plaintiff Class' claims, especially failure to recognize that Harvoni treatment is and has been an FDA-approved treatment;

     (d)    Failure to consider the overwhelming medical evidence which showed the requested treatments are safe and effective and applicable to all individuals diagnosed with the deadly disease.

55. Plaintiff and the Plaintiff Class are informed and believe and thereon allege that Defendant wrongfully denied the claims for benefits by other acts or omissions of which Plaintiff and the Plaintiff Class is presently unaware, but which may be discovered in this litigation and which Plaintiff and the Plaintiff Class will immediately make Defendant aware of once said acts or omissions are discovered by Plaintiff.

56. As a proximate result of the denial of prescription benefits, Plaintiff and the Plaintiff Class have been damaged in the amount of the cost treatment for their prescribed Harvoni treatment regimen.

57. As a further direct and proximate result of this improper determination regarding the medical claims, Plaintiff and the Plaintiff Class, in pursuing this action, has been required to incur attorneys' costs and fees. Pursuant to 29 U.S.C. § 1132(g)(1), Plaintiff and Plaintiff Class are entitled to have such fees and costs paid by Defendant.

58. Due to the wrongful conduct of Defendant, Plaintiff and the Plaintiff Class are entitled to enforce their rights under the terms of Defendant's applicable plans and to clarify their rights to future benefits under the terms of the those applicable plans.

## SECOND CAUSE OF ACTION
## FOR BREACH OF FIDUCIARY DUTY UNDER AN ERISA PLAN
## [29 U.S.C. § 1132(a)(3)]

59. Plaintiff and the Plaintiff Class repeat and re-allege each and every allegation set forth in all of the foregoing paragraphs as is fully set forth herein.

60. Defendant acts as an ERISA fiduciary with respect to the administration and claims decisions of the group health plans it issues to employers, such as the Plan at issue, within the meaning of 29 U.S.C. §§ 1109(a) and 1002(21)(A). With respect to these plans, Defendant exercises discretionary authority or control respecting management of the plans, exercises authority or control respecting management or disposition of the plans' assets. Defendant has the authority, and actually exercises the authority, to fund the plans, make decisions on claims for benefits and appeals thereof, and to write checks for benefits.

61. Defendant has categorically and improperly denied requests for Harvoni treatment, as alleged above.

62. In acting and failing to act as described above, Defendant has breached its fiduciary duties.

63. Pursuant to 29 U.S.C. § 1132(a)(3), Plaintiff and the Plaintiff Class seek equitable and remedial relief as follows:

    a. An injunction compelling Defendant to: (1) retract its categorical "investigational" denial basis of Harvoni treatment; (2) provide notice of said determination in the form and manner required by ERISA to any and all self-funded and fully-insured plans' subscribers/members who have had requests for Harvoni treatment denied; and (3) provide for the re-review of all improperly denied claims.

    b. An accounting of any profits made by Blue Shield from the monies representing the improperly denied claims and disgorgement of any profits;

c.   Such other equitable and remedial relief as the Court may deem appropriate; and

d.   Attorneys' fees in an amount to be proven at the time of trial.

## REQUEST FOR RELIEF

Wherefore, Plaintiff and the Plaintiff Class pray for judgment against Defendant as follows:

1.   Payment of health benefits due to Plaintiff and the Plaintiff Class under Defendant's applicable plans;

2.   Reconsideration by Blue Shield of all claims for Harvoni treatment;

3.   Injunctive relief, as described above;

4.   Disgorgement of all profits unjustly retained by Blue Shield as the result of its wrongful denials of authorization for Harvoni treatment;

5.   Pursuant to 29 U.S.C. § 1132(g), payment of all costs and attorneys' fees incurred in pursuing this action;

6.   Payment of prejudgment and post-judgment interest as allowed for under ERISA; and

7.   For such other equitable and remedial relief as the Court deems just and proper.

DATED: October 30, 2015           KANTOR & KANTOR, LLP


                                  By:   /s/ Glenn R. Kantor
                                        Glenn R. Kantor
                                        Timothy J. Rozelle
                                        Attorneys for Plaintiff
                                        ARAM HOMAMPOUR, on behalf of
                                        himself and all others similarly
                                        situated

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525